**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lindsay R. Murrell-Travland; and Sonny N. Travland,<br><br>Plaintiffs,<br><br>v.<br><br>On Q Financial, Inc., an Arizona corporation,<br><br>Defendant. | No. CV-11-01622-PHX-GMS<br><br>**JUDGMENT ORDER** |

Pending before the Court is the verdict on Plaintiff Lindsay Travland's Title VII pregnancy discrimination claim and the issue of appropriate equitable relief.

**I.   JURY VERDICT**

Travland claimed that Defendant On Q Financial, Inc. discharged her on the basis of her pregnancy in violation of Title VII's prohibition on sex discrimination.[1] After hearing all the evidence, the jury returned a verdict that answered specific interrogatories. The jury made the following determinations: (1) Travland's pregnancy or her request to

---

[1] The statute defines sex discrimination in the following manner:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k).

take time off for childbirth was a motivating factor for On Q's decision to discharge her; (2) On Q's decision to discharge Travland was also motivated by a lawful reason; (3) On Q would not have made the same decision to discharge Travland even if Travland's pregnancy or her request to take time off for childbirth had played no role in On Q's decision to discharge Travland; (4) Travland was entitled to compensatory damages; and (5) Travland was not entitled to punitive damages. (Doc. 92.) The jury awarded Travland $68,000 in compensatory damages.

Nevertheless, the parties acknowledge that, pursuant to statute, a jury's award of compensatory and punitive damages on Title VII claims against an employer of On Q's size are collectively capped at $50,000, in addition to any equitable back pay award to be calculated by the Court. 42 U.S.C. § 1981a(b)(3)(A). The Court therefore reduces the compensatory damages award on Travland's claim to $50,000.

**II.    BACK PAY**

Title VII of the Civil Rights Act of 1964 permits courts to grant equitable remedies to employees who have been subjected to impermissible discrimination by employers with fifteen or more employees. *See* 42 U.S.C. § 2000e–5(g). "The relevant remedies include reinstatement and awards of back pay and front pay." *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1020 (9th Cir. 2000). "The district court has wide discretion in awarding remedies to make a Title VII plaintiff whole." *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495 (9th Cir. 1995). In making its equitable award, the Court relied on the following determinations.

Travland is seeking back pay for a 53 week period from October 9, 2007, the day of her termination, until October 15, 2008.

At the time of her termination, Travland's yearly salary was $68,000. Her weekly salary was therefore $1,307.69.

The appropriate cutoff date for back pay is the end of March 2008. The uncontroverted evidence is that Travland had a job offer on that date from Colonial Insurance. Under Title VII's provisions for back pay, "interim earnings or amounts

earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). Consequently, a plaintiff seeking back pay has "a duty to mitigate damages by seeking alternative employment with 'reasonable diligence.'" *Caudle*, 224 F.3d at 1020. The Supreme Court described this duty as "ancient" and observed that, "[a]lthough the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. E. E. O. C.*, 458 U.S. 219, 231–32 (1982). This is "because the availability of [a] better job terminates the ongoing ill effects of the defendant's refusal to hire the claimant." *Id.* at 234. The defendant bears the burden of showing "(1) there were suitable positions available for [plaintiff]; and (2) she failed to use reasonable care and diligence in seeking out those positions." *E.E.O.C. v. High Speed Enter., Inc.*, 833 F. Supp. 2d 1153, 1162 (D. Ariz. 2011) (citing *Jackson v. Shell Oil*, 702 F.2d 197, 202 (9th Cir. 1983); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 906 (9th Cir. 1994)).

The primary question is whether the Colonial Insurance job was suitable. While this position required a different skill-set than her work as a mortgage loan processor, Travland testified that she had been performing similar work and had even formed an LLC to focus on business-to-business group health insurance. With regard to income, Travland testified that she could have earned $75,000–100,000 a year in commissions working as an independent contractor with Colonial. That arrangement differs from her previous position, which came with the comfort of a salary, benefits, and overtime. Still, that salary was $7,000 less than the low end of Travland's own estimate of what she would likely make as an independent contractor for Colonial. In light of the significantly higher level of income (at least 10%) that Travland would gain working for Colonial and the fact that Travland already had the necessary skill-set to succeed in that job, the Court concludes that the Colonial job was substantially equivalent to the position Travland held with On Q. Travland's contention that taking the job would present childcare

complications does not make the job unsuitable. Any full-time position would require childcare adjustments. The fact that this job would have paid on commission does not so complicate the matter of paying for childcare as to render it unsuitable. Consequently, her refusal to take that job terminates On Q's liability for back pay.

Because the position was offered at the end of March 2008, the Court will terminate On Q's back pay liability at the first week of April 2008. Travland is consequently entitled to 25 weeks of back pay. Her unadjusted pay entitlement is $32,692.30.

At the time of her termination, Travland had accrued 145 hours of "paid time off" or PTO. She was earning an annual salary of $68,000, at an hourly rate (assuming a 5 day, 8 hour workweek) of $32.69. She was therefore entitled to $4,740.38 in accrued PTO. However, Travland testified that she had to take six weeks off of work to deliver her baby and would have exhausted any accrued PTO for that purpose. Because the Court has not yet deducted any of those six weeks from her back pay entitlement, the PTO is already included in her back pay recovery.[2]

The Court now makes the following deductions from the $32,692.30. As discussed above, Travland was under doctor's orders not to return to work after her delivery for six weeks, which amounts to 30 work days, or 240 work hours. She would have used her 145 hours of PTO to cover some of that time off, but would not be working for the remaining 95 hours. Travland did not testify that she would have otherwise been working and entitled to her salary during that period. Consequently, the Court deducts $3,105.77 from her pay, bringing the subtotal to $29,586.53.

Travland testified that she was offered a severance package that included approximately 30 days of pay. Nevertheless, she also testified that she did not sign the agreement, and thus, presumably, did not receive the 30 days of pay—at least there was no evidence to that effect. No deduction has been made on this basis.

---

[2] Travland has avowed that she is not seeking the value of any other lost benefit.

Travland received state unemployment benefits totaling $13,285.00 during this period, and around $3,000 in disability benefits. On Q contends that these benefits should be deducted from any award of back pay. The collateral source rule, however, states that "'benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages.'" *McLean v. Runyon*, 222 F.3d 1150, 1155–56 (9th Cir. 2000) (quoting 1 Dan B. Dobbs, *Law of Remedies* § 3.8(1) at 372–73 (2d ed. 1993)). The rule ensures that a defendant does not "get a windfall for collateral benefits received by the plaintiff." *Id.* at 1156; *see also Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534 (9th Cir. 1962) ("As between the injured person and the tortfeasor, the former's claim is the better. . . . The tortfeasor bears only the single burden for his wrong. That burden is imposed by society . . . to deter" wrongful conduct."). While Defendant may be responsible for an increased unemployment tax for its former employees that are awarded benefits, it presented no evidence or argument to this effect, or to otherwise demonstrate that the benefits awarded by the state were not truly collateral. Nor did On Q present any other evidence or assertion that unemployment benefits do not fall within what might otherwise be characterized as benefits from a collateral source. The unemployment and disability benefits were collateral.

The Ninth Circuit has observed, that "[o]ur precedent is not absolutely clear as to whether a district court has discretion to deduct collateral benefits from a damages award under Title VII." *McLean*, 222 F.3d at 1156 n.7. *Compare Kauffman v. Sidereal*, 695 F.2d 343, 347 (9th Cir. 1982) ("We . . . hold that unemployment benefits received by a successful plaintiff in an employment discrimination action are not offsets against a [Title VII] back pay award."), *with Naton v. Bank of California*, 649 F.2d 691, 700 (9th Cir. 1981) (holding that district court had discretion to deduct collateral benefits from a back pay award under the ADEA, which uses the same standards as Title VII); *see also Lussier v. Runyon*, 50 F.3d 1103, 1109 (1st Cir. 1995) (concluding that *Kauffman* and *Naton* reflect "an internal division" in this circuit on the issue whether district courts have discretion to deduct collateral benefits from damages awards under anti-discrimination

statutes).

In the absence of any argument or evidence that unemployment benefits are not truly a "collateral source," this Court follows *Kauffman*. Its language is clear that state unemployment benefits should not be deducted from any award of back pay under Title VII. 695 F.2d at 347. That case is the most factually similar, since it involved an award under Title VII while *Naton* involved a different statute, and it is the Ninth Circuit's latest pronouncement on the topic. Therefore, the Court makes no deduction for the state unemployment or disability benefits awarded to Travland.

The Court therefore awards Travland $29,586.53 in back pay. "An award of prejudgment interest on a back pay award is appropriate." *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984). The interest rate used to calculate prejudgment interest is within the discretion of the trial judge. *W. Pac. Fisheries, Inv. v. SS President Grant*, 730 F.2d 1280, 1288 (9th Cir. 1984). This discretion must be exercised with a view to the fact that prejudgment interest is an element of compensation, not a penalty. *Id.*; *Jung v. Potter*, No. CV 04–429–PHX–MHM, 2008 WL 2620905 at *6 (D. Ariz. July 1, 2008). In calculating prejudgment interest, the Court will use the weekly average 1–year constant maturity Treasury yield. *See id.*; *see also Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007) ("Generally, 'the interest rate prescribed for post judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.'" (quoting *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163–64 (9th Cir. 2001)). For the day ending July 25, 2013, the applicable interest rate was 0.12%,[3] yielding prejudgment interest of $213.66.

Although neither party discussed the issue of postjudgment interest, "[u]nder the provisions of 28 U.S.C. § 1961, postjudgment interest on a district court judgment is mandatory." *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290

---

[3] Selected Interest Rates, Board of Governors of the Federal Reserve System, http://www.federalreserve.gov/releases/h15/update/.

- 6 -

1 (9th Cir. 1995) (citing *Perkins v. Standard Oil Co.*, 487 F.2d 672, 674 (9th Cir. 1973)). Postjudgment interest applies to the entire judgment, including principal, prejudgment interest, attorneys' fees, and costs. *Id.* at 291. The postjudgment interest rate is set "at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment." 28 U.S.C. § 1961(a). Accordingly, the Court will award post-judgment interest at 0.12% per year.

After making the relevant deductions, the Court awards Travland $29,800.19 in back pay, inclusive of prejudgment interest. Together with the compensatory damages awarded by the jury, which are capped at $50,000, judgment is entered in Travland's favor on her Title VII and Pregnancy Discrimination Act claims in the total amount of $79,800.19.

**IT IS THEREFORE ORDERED**, pursuant to Rule 58 of the Federal Rules of Civil Procedure, entering judgment on Travland's claim in her favor and against On Q in the amount of $79,800.19.

Dated this 30th day of July, 2013.

*A. Murray Snow*
G. Murray Snow
United States District Judge